### LEHIGH VALLEY R. CO. v. EVANS.
### EVANS v. LEHIGH VALLEY R. CO.
### THE NO. 128.
### THE S. S. FORT REMY.
Nos. 17315, 18128.

District Court, E. D. New York.
Jan. 9, 1948.

Pyne, Lynch & Smith, of New York City, (Warner Pyne, of New York City, of counsel), for libellant-cross-respondent.

136

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Leo J. Curren, of New York City, of counsel), for Fort Remy.

GALSTON, District Judge.

At the trial the libel and cross-libel were consolidated, and it was stipulated that the issues would be disposed of in one decree.

The vessels involved were the Lehigh Valley Railroad deck scow No. 128, which was in tow of the tug Victor, on her port side, the tug having the scow No. 105 also in tow on her starboard side, and the approaching steamship Fort Remy. A collision occurred in the Hudson River off the New York pier ends, at a distance of from 600 to 800 feet, and in the vicinity of pier 45.

The Victor and her tow at about 8:05 a.m. had left the railroad piers in Morris Canal Basin, Jersey City, bound for Pier 57, North River, Manhattan. The weather was clear and there was not enough wind to affect navigation. The tide was flood.

Resolving the contradictory versions of the collision as given by opposing groups of witnesses, I was persuaded that that of the libellant more accurately presents what actually occurred that morning. The master of the Victor not only was an experienced navigator on harbor craft, but more particularly impressed me with his honesty and desire to present the situation as he saw it. Moreover, as is always an important factor in determining the facts, disinterested witnesses such as the captains of two Lackawanna ferryboats corroborate his story.

As the Victor proceeded across the river, and reached a point abreast of the Lackawanna Railroad float bridges on the Jersey shore, O'Keefe temporarily altered his course and proceeded on a line straight up the Hudson River in order not to crowd an inbound steamship which was moving abreast of the Victor and her tow on the Victor's starboard side, between the tow and the New York pier ends. The Victor at that time was about mid-stream. The Victor proceeded on this course for a distance of about 300 yards; and then, after the inbound steamer had passed giving clearance, resumed her diagonal course across the river, heading for Pier 57. It was at that time that the Victor sighted the Fort Remy, about three-quarters of a mile distant, bound down stream, then in the vicinity of 6th or 8th Street, Hoboken and one-quarter of the width of the river off the Jersey piers. Believing that a port to port passage was indicated, the Victor blew a one blast passing signal to the Fort Remy. To that signal the Fort Remy made no reply. Both Helble, master of the ferryboat Buffalo, and Fulcher, master of the ferryboat Chatham, heard the signal and heard no reply from the Fort Remy. At this time the Fort Remy was also on a diagonal course across the river, headed towards the New York shore.

The signal situation was somewhat complicated by a two-whistle exchange between the ferryboat Chatham and the Victor, the former proceeding from the Manhattan slip and bound for Hoboken. The Victor had seen the Chatham cross ahead of the inbound steamer hereinbefore referred to, before heading down river against the flood tide. The Chatham blew the Victor a two-whistle signal, which the Victor answered with the corresponding signal. The Chatham passed under the starboard stern of the Victor tow. The Fort Remy was then about one-quarter of a mile distant and still to the port side of the Victor. O'Keefe blew another one-whistle signal, and since the Fort Remy continued going towards the Victor after this second one-blast signal, O'Keefe put his wheel hard to starboard, with the vessels then only a distance of about 400 to 500 feet from each other. In turning to starboard, and heading down the river, O'Keefe gave the engines an extra jingle, though before he had been traveling at normal full speed ahead and making about four miles through the water. He estimated the speed of the Fort Remy at nine or ten miles an hour. The Fort Remy blew a two-whistle signal and sounded an alarm, which O'Keefe said were the first signals he had received from that steamer, just before the Victor made the starboard turn. However, O'Keefe's maneuver failed to avoid a collision, for the Fort Remy hit the port after corner of the No. 128.

It is of significance that the pilot of the Fort Remy admitted that at some time he

heard a one-whistle signal from the Victor, but before that, believing that there was no danger of collision, he had given a two-whistle signal. O'Keefe heard no such original two-whistle signal. At least, therefore, so far as the Fort Remy was concerned, there is here an admission that there was no agreement reached on the exchange of signals. The pilot admitted that in such a situation, "I suppose we could have stopped the engines to make sure, but I blew the alarm immediately."

There is no doubt that the vessels were approaching each other on crossing courses, and in such manner as to involve risk of collision. The Fort Remy was the burdened vessel and should have yielded to the Victor; Title 33 U.S.C.A. § 204 provides: "Steam vessels crossing. Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." See The Hoboken, 2 Cir. 59 F.2d 993. It seems clear that the collision was attributable soley to the fault of the Fort Remy.

The libellant, the Lehigh Valley Railroad Co., may have a decree, and the cross-libel will be dismissed.

Appropriate findings of fact and conclusions of law will be filed.